**In re Archdiocesan Cemeteries**

C.P. of Philadelphia County, No. 1366 NP of 2013

*Russell J. Ressler* and *Kevin R. Boyle*, for Archdiocese of Philadelphia.
*Denis J. Lawler*, for StoneMor.
*Lawrence Barth*, Senior Deputy Attorney General.

HERRON, *J.*, February 4, 2014—The petition filed by the archdiocese of Philadelphia raises the issue of whether

entering into a lease agreement and a management agreement with a third party cemetery company for the maintenance, management and operation of thirteen archdiocesan cemeteries constitutes a diversion of property from the purposes, uses and trusts to which these cemeteries have been lawfully dedicated. In entering these agreements, the archdiocese emphasizes its intent to maintain ownership of the cemeteries as well as their Catholic character. By entering into lease and management agreements with StoneMor Operating LLC, StoneMor Pennsylvania LLC, and StoneMor Pennsylvania Subsidiary LLC. (collectively "StoneMor"), the archdiocese endeavors to mitigate the administrative and financial burdens that its own management of the cemeteries might otherwise impose.

After careful consideration of the petition, the addendum, the certification of service, and the hearings, this court concludes that the archdiocese's proposed lease and management agreements with StoneMor do not constitute a diversion of property from the purposes, uses and trusts to which they have been lawfully dedicated. Whether these agreements are financially prudent is beyond the scope of this court's review.

## Procedural History

A critical, initial concern raised by the archdiocese's petition to transfer management of its thirteen cemeteries was to assure that all parties in interest had notice of the petition and any hearing. Because of the delicate issues and concerns raised by this petition, this court on October 29, 2013 issued a decree requiring that the notice set forth in the petition's "advertisement" be given to lot holders in all 13 archdiocesan cemeteries listed in the petition as

follows:

a. Publication in *The Philadelphia Inquirer* (a newspaper of general circulation in Philadelphia and surrounding counties) over three consecutive weeks;

b. By posting on or near the front door of the main cemetery office or other prominent place at each of the cemeteries;

c. By posting on or near the front door of the nearest Catholic Church to each cemetery location referenced in the petition; and

d. By inserting the advertisement in any publication of the Catholic Church disseminated to parishioners in the geographical area where the cemeteries are located on at least one occasion prior to a hearing.

A hearing was scheduled for December 11, 2013 where the archdiocese was required to certify that it had provided the requisite notice. At that December hearing, however, this court ordered a continuance until January 6, 2014 to allow for additional good faith efforts to provide adequate notice to individuals affected by the proposed lease of these Catholic cemeteries.

At the beginning of the January 6, 2014 hearing, counsel for the archdiocese outlined its various efforts to notify interested parties about the petition and hearing. A written certification submitted by petitioner's counsel also outlined these efforts and is attached. Counsel noted that in addition to the actions outlined in the certification, there had been news stories in the Delaware County Times as well as on KYW during the weekend prior to the January hearing. The advertisement was posted in its original

form in the *Philadelphia Inquirer* over three consecutive weeks (November 8, November 15 and November 27). The advertisement was also posted on or near the front door of the main cemetery offices or other prominent places for several weeks prior to the initial December 11, 2013 hearing. Beginning the week of November 23, the advertisement was inserted into the parish church bulletins in the areas near the cemeteries in the two consecutive weekends prior to the December hearing.[1]

In response to the December 11, 2013 order, the archdiocese for the second time posted a revised advertisement in the *Philadelphia Inquirer* over three specific weeks: December 20, 2013; December 27, 2013 and January 3, 2014. The revised advertisement gave notice of the new hearing date, the existence of a dedicated website and advised that objections could be made in writing filed with the court or by appearing at the January hearing. On December 20, 2013, the archdiocese website page established a prominent link giving notice of the public hearing, and making available for downloading such documents as: the petition; notice of the hearing; a list of frequently asked questions; the lease agreement; the management agreement; a side letter regarding the trust; a side letter regarding employees and a news release. A notice of the new hearing date was also posted on www. Catholicphilly.com website. In addition, good faith efforts were made to insert the advertisement in the bulletins of all the active archdiocesan parishes on December 22, 2013, December 29, 2013 and January 5, 2014. Finally, around December 19, the revised bulletin was mailed to cemetery plot owners who are currently receiving invoices.

---

1. 1/6/14 N.T. at 6-9.

In response to these notices, the archdiocese received more than 200 communications, by phone or letter. It forwarded the written correspondence to this court.[2] In response to his notice, the attorney general issued a letter of no objection. Upon questioning by this court, Lawrence Barth, senior deputy attorney general, clarified that with this letter of no objection the attorney general's office was taking the position that the proposed transactions did not constitute a diversion of property from its dedicated purposes.[3]

Under the proposed transactions, the archdiocese and StoneMor would enter into a lease agreement for the following eight cemeteries:

Holy Sepulchre Cemetery in Philadelphia, Pennsylvania Calvary Cemetery in West Conshohocken, Pennsylvania SS. Peter and Paul Cemetery in Springfield, Pennsylvania All Saints Cemetery in Bucks County, Pennsylvania All Souls Cemetery in Coatesville, Pennsylvania St. John Neumann Cemetery in Chalfont, Pennsylvania Resurrection Cemetery in Bensalem Pennsylvania Holy Savior Cemetery in Chester County Pennsylvania

The introductory provisions of the lease agreement affirms that the "landlord desires to pursue projects which provide for the maintenance, upkeep, improvement and continued mission of the cemeteries in a manner consistent with the standards, customs and practices of the Roman Catholic Church."[4] The lease requires the

2. 1/6/14 N.T. at 9-13.
3. 1/6/14 N.T. at 15 (A.G. Barth).
4. 10/15/13 petition, ex. D — lease agreement (hereinafter "lease agreement") at 1.

tenant to make an upfront rental payment of $53,000,000 to the archdiocese. Beginning in the sixth year, the tenant would be required to pay a fixed rent of $1,000,000 per year with increases periodically until the 35th lease year.[5] The intricate 60 page lease agreement contains various provisions, including the tenant's right to propose to develop non-christian and/or non-sectarian burial grounds at Holy Savior Cemetery, All Saints Cemetery and All Souls Cemetery. These proposals are subject to the landlord's consent which shall not be unreasonably withheld. During the first two (2) years of the lease, there shall be no non-catholic burial at the cemeteries, except to the extent that the landlord grants permission in accordance with its custom and practice. Approximately 5% of the current burials are non-catholics.[6] After two years, the tenant shall have the right to conduct christian burials in catholic burial gardens subject to the landlord's consent.[7] The lease gives the tenant the right to request the sale of undeveloped property in the cemeteries, but the landlord has the absolute discretion to reject that proposal. If the landlord agrees to the proposed sale, the tenant is required to pay it 51% of the net proceeds as additional rent.[8] With the written consent of the landlord, the tenant shall have the right to construct and maintain cell phone towers in a reasonable location and reasonable manner. Any revenues from such structures would be shared as set forth in Art. 11, Section 2.10.[9]

The archdiocese and StoneMor also proposed to enter

---

5. Lease agreement, art. 11, §§ 2.1 & 2.2
6. 1/6/14 N.T. at 67 (O'Shaughnessy).
7. Lease, art. II, §§ 2.5 and 2.6.
8. Lease, art. II, §2.4.
9. Lease, art. II, §2.8

into a management agreement for the following five cemeteries:

Holy Cross Cemetery in Yeadon, Pennsylvania Immaculate Heart of Mary Cemetery in Linwood, Pennsylvania St. Michael Cemetery in Chester, Pennsylvania Cathedral Cemetery in Philadelphia, Pennsylvania New Cathedral Cemetery in Philadelphia, Pennsylvania

The management agreement charged the tenant with "[m]aintaining the existing character of the cemeteries and keeping in good order, condition and repair all facilities and properties within the cemeteries, including access roads, streets, sidewalks and curbs, in a manner which is consistent with the current design and appearance of the cemeteries and with the Standards of Care for the Catholic Cemeteries of the Archdiocese of Philadelphia...."[10]

The financial considerations motivating the archdiocese's decision to enter into the lease and management agreements were spelled out during the hearing by Timothy O'Shaughnessy, chief financial officer of the archdiocese of Philadelphia since April 2012. He noted that around 2011 a financial review by the archbishop uncovered two compelling financial issues confronting the archdiocese. First, the archdiocese was operating with a significant deficit in the range of $15 to $20 million a year. In response, the archdiocese took steps to reduce this deficit to $5 million on an annual basis. The second financial issue facing the archdiocese is its unfunded liabilities in excess of $300 million which Mr. O'Shaughnessy

___

10. 10/15/13 Archdiocese petition, ex. E, management agreement (hereinafter "management agreement"), article II, § 2.01(a).

characterized as "the result of financial mismanagement that took place over a period of time."[11] In broad terms, Mr. O'Shaughnessy identified four components of these liabilities: the lay person pension plan as of June 30, 2013 was underfunded by approximately $140 million; the priest pension plan is underfunded by approximately $90 million; insurance liability is underfunded by $30 million, and; approximately $80 million is owed to the trust and loan fund which is the parish deposit money.[12]

To reduce these deficits, the archdiocese has taken various actions. In June 2012, it laid off 50 people. It sold a retirement home for clergy in Ventnor, New Jersey. It sold the archbishop's residence on City Line Avenue. It now seeks to address the financial costs of operating its thirteen cemeteries. A financial review of the cemeteries disclosed that they had a cumulative operating loss of around $6 million over the past three fiscal years. To stem these losses, the archdiocese engaged the international financial accounting and advisory firm, KPMG, to review potential transactions, including the proposed agreements with StoneMor. An internal finance council also analyzed this StoneMor transaction. In the summer of 2012, the archdiocese began a series of negotiations, and by that fall it focused exclusively on striking an agreement with StoneMor.[13]

It is of critical importance that under the terms of the transaction with StoneMor, Mr. O'Shaughnessy testified, the archdiocese retains ownership of the cemeteries.[14] Of

---

11. 1/6/14 N.T. at 47 (O'Shaughnessy).
12. 1/6/14 N.T. at 46-48 (O'Shaughnessy).
13. 1/6/14 N.T. at 46, 49-50 (O'Shaughnessy).
14. 1/6/14 at 52.
Q: So this is a lease and management agreement; it's not a sale?

the total thirteen archdiocesan cemeteries, the five that will be subject to a management agreement "are more or less full today and won't present much opportunity for future sale of burial rights. For the most part, they need to be cared for at this point."[15] The other eight cemeteries will be subject to a lease agreement. The archdiocese will receive an upfront payment of $53 million for StoneMor prior to their commencing operations. Beginning from year 6 through year 35 the archdiocese would receive additional rents with a cumulative value of $36 million. Mr. Shaughnessy testified that StoneMor is a large cemetery operating company for over 250 cemeteries in 27 states and Puerto Rico. The archdiocese plans to use the $53 million upfront payment from this transaction to reduce the shortfall in the trust and loan fund by $30 million, with the balance split evenly between the insurance fund and priest pension fund.[16]

After Mr. O'Shaughnessy completed his testimony, those present at the hearing with objections were invited to testify. One witness, who identified himself as a funeral director who sells vaults and caskets, expressed criticism of any sale of cemetery property where the archdiocese would receive 51% of the net proceeds. He was also concerned about allowing burial of non-catholics in a catholic cemetery without the customary letter from a priest.[17] Another witness stated that she had concerns StoneMor might have access to the Perpetual Care trust fund, despite testimony that those funds would go into an

---

A: Correct. We will retain ownership of the cemeteries. (O'Shaughnessy).

15. 1/6/14 N.T. at 51 (O'Shaughnessy).

16. 1/6/14 N.T. at 52-57 (O'Shaughnessy).

17. 1/6/14 N.T. at 73-80 (Francis Galante)

irrevocable trust.[18] Another witness expressed her concern that plots where her relatives were buried might be sold.[19] Other witnesses stated their concern that the catholic church was abandoning its cemeteries which are a sacred trust or that the installation of cell phone towers would imperil the peace and quiet of the cemeteries.[20]

## Legal Analysis

Beyond its precise legal issues, the archdiocese's petition implicates delicate issues of faith and mortality. This is reflected in the various letters that were sent directly to this court or to the petitioner. It is nonetheless essential to keep a sharp focus on the applicable legal standard. It is well established that "the law of Pennsylvania prevents a diversion of church property from a use to which it was originally dedicated to another inconsistent use." *Saint John the Baptist Greek Catholic Church of Allentown v. Musko*, 448 Pa. 136, 142, 292 A.2d 319, 322 (1972) (citation omitted). This principle has been embraced by the legislature as set forth in 10 P.S. section 81 which provides:

Whensoever any property, real or personal, has heretofore been or shall hereafter be bequeathed, devised, or conveyed to any ecclesiastical corporation, bishop, ecclesiastic, or other person, for the use of any church, congregation, or religious society, for or in *trust for religious worship or sepulture, or for use*

---

18. 1/6/14 N.T. at 88-92 (J. White). *See also* 116114 N.T. at 58 & 69 (T. O'Shaughnessy testifying that with the consummation of this transaction, the Perpetual Care Trust Fund of approximately $30 million would be transferred into an irrevocable trust and the interest would not be available to StoneMor).

19. 1/6/14 N.T. at 94-97 (A. Crescenzo)

20. 1/6/14 N.T. at 105 (P. Brennan) and at 99 (C. Landy).

*by said church, congregation, or religious society, for a school, educational institution, convent, rectory, parsonage, hall, auditorium, or the maintenance of any of these,* the same shall be taken and held subject to the control and disposition of such officers or authorities of such church, congregation or religious society, having a controlling power according to the rules, regulations, usages, or corporate requirements of such church, congregation, or religious society, which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church, congregation or religious society shall belong, but nothing herein contained shall authorize the diversion of any property from the purposes, uses, and trusts to which it may have been heretofore lawfully dedicated or to which it may hereafter, consistently herewith, be lawfully dedicated. 10 P.S. §81 (emphasis added).

A potential threshold issue is whether an Orphans' Court in Philadelphia has jurisdiction over the management of cemeteries located in outside counties. Upon request, the parties convincingly addressed this issue in careful, exhaustive briefs. They argue that the archdiocese is an unincorporated nonprofit entity that is analogous to either a trust or a nonprofit corporation. While both analogies have a certain merit, the trust analysis is more compelling and consistent with the relevant analysis under 10 P.S. §81.

In its brief, the archdiocese notes that it was established in 1873 for charitable and religious purposes. It was never formally incorporated. According to StoneMor,

"[t]itle to the cemeteries was acquired over the years by deeds in the names of various bishops and archbishops in their official capacities on behalf of the archdiocese."[21] Under the recent amendments of the Pennsylvania Uniform Unincorporated Nonprofit Association Law, 15 Pa.C.S. A. §§ 9111 and 9115(b) effective September 9, 2013, the acquisition of these properties is akin to a trust relationship for the benefit of the archdiocese as an unincorporated association.[22] Nonetheless, section 9111 of the Pennsylvania Uniform Unincorporated Nonprofit Association Law specifically states that "[n]othing in this chapter shall be deemed to repeal or supersede section 7 of the act of April 26, 1855"(10 P.S § 81),[23] which are the provisions the archdiocese invokes in its initial petition seeking a determination that its proposed agreements with StoneMor do not constitute a diversion of charitable assets.

Under the PEF code, this Orphans' Court clearly has jurisdiction over inter vivos trusts. *See* 20 Pa.C.S. §711(3). When a court has jurisdiction over a trust, the PEF code provides that venue shall be where the situs of the trust is located. 20 Pa.C.S. § 722. In this case, that

---

21. 1/16/14 StoneMor brief at 2. *See also* 1/16/14 archdiocese brief at 3-4.

22. *See, e.g.* 15 Pa.C.S.A. § 9111 (b) and § 9115(b). The committee comment — 2013 to section 9115 notes that at common law a nonprofit association was not a legal entity and as a consequence "it could not acquire, hold or convey real or personal property." This chapter changes the law to make such a transfer of property effective: "Sub-section 9111(b)(1) is not a retroactive rule, It applies to the facts existing when this chapter took effect. At that time, subsection (b)(1) applies to a purported transfer of property that under prior law could not be given effect at the time it was made. Subsection (b)(1) belatedly makes it effective when this subchapter took effect and not when made." Committee comment-2013 to 15 Pa.C.S.A. §9111.

23. *See* 15 Pa.C.S. §9111(c)(1).

situs is Philadelphia, which is the headquarters for the archdiocese. Moreover, according to StoneMor, all of the deeds of the cemeteries are titled in the name of archdiocese or in the name of the archbishop at the time the cemetery was purchased. The archdiocese's petition asks for a determination as to the contractual relations between the two parties in the management of the cemeteries. It does not implicate a sale or transfer of title to that property. Consequently, it is an action in personam and not in rem over which this court may exercise jurisdiction. *See, e.g. Stefanick v. Minucci*, 460 Pa. 574, 576, 333 A.2d 920, 922 (1975)(distinguishing between an in personam action to compel an agreement of sale for real property from an in rem action to quiet title); *Esposita v. Peden*, 9 Pa. D & C 3d 712, 717 (Ct. Common Pleas Somerset Cty. 1978) ("[A]n action for specific performance of a contract is a transitory in personam action").

Although both parties offer the alternative view that the archdiocese be analogized to a nonprofit corporation, that approach leads to serious ambiguities under 20 Pa.C.S.A § 726. This is because Section 726 provides that venue for a nonprofit corporation would be either in the county where the registered office is located or in the absence of such registered office, "in a county where any property held or controlled by the nonprofit corporation is located."[24] Since the archdiocese appears to admit that it has no registered

---

24. Section 726 provides: *Venue of nonprofit corporations* except as otherwise prescribed by general rules, in exercising the jurisdiction of the court over the property or affairs of a domestic or foreign nonprofit corporation, the venue shall be in the county where the registered office of the corporation is located or deemed to be located for venue purposes or, in the absence of a registered office within this Commonwealth, in a county where any property held or controlled by the nonprofit is located." 20 Pa.C.S. A. § 726.

office,[25] Section 726 would appear to root venue in the diverse counties where the cemeteries are located. Another PEF Code section not cited by the parties is 20 Pa.C.S. § 727 which provides that venue for cemetery companies "shall be in the county where the burial ground, or any part thereof, is located...." It is well established, however, the claims of improper venue may be waived. *See, e.g.* Pa.R.C.P. 1006 (3)(e); *Zappala v. Brandolini Prop. Mgmt. Inc.*, 589 Pa. 516, 538, 909 A.2d 1272, 1285 (2006).

In this case, both parties have submitted themselves to the jurisdiction of this court, waiving any claims of improper venue which are, of course, distinct from jurisdiction. For all of these reasons, the statutory provisions supporting the trust analogy on the facts of this case offer the clearer, more convincing guidance.

In turning to the narrow substantive issue of whether the proposed lease and management agreements constitute a diversion of any property from the purposes, uses and trusts to which the cemeteries have been lawfully dedicated as set forth in 10 P.S. §81, the assurances of the attorney general[26] are highly persuasive because he is charged with protecting such interests. *See e,g., Com. v. Citizens Alliance for Better Neighborhoods*, 983 A.2d 1274, 1277 (209)("it is the well settled law of the Commonwealth that the attorney general is responsible

---

25. In somewhat tortured argument, the archdiocese's brief states: "If the archdiocese had been incorporated, Section 726 of the PEF code unquestionably would require venue in Philadelphia County alone since the archdiocese's registered office would be located in Philadelphia. It would be counterintuitive to conclude that, simply because the archdiocese is unincorporated, the legislature would require it to file actions in counties other than Philadelphia even though, similar to a corporation registered in Philadelphia, the archdiocese established its headquarters in Philadelphia." 1/16/14 archdiocese brief at 9.

26. 1/6/14 N.T. at 15 (Lawrence Barth).

for the public supervision of charities through his *parens patriae* powers"). Significantly, no formal objections have been filed of record to the archdiocese's petition despite the extensive notice outlined at the beginning of the January 6, 2014 hearing. One of the concerns expressed by a witness at the hearing that StoneMor might access the Perpetual Care Fund was specifically raised by Mr. Barth's questioning of Mr. O'Shaughnessy who confirmed that once that fund was transferred to an irrevocable trust, StoneMor would not have access either to it or its earnings. Moreover, he confirmed that such actions as building cell phone towers and the sale of property would be subject to the approval of the archdiocese.[27] Finally, both the lease and management agreements state their intent to maintain the catholic nature of the cemeteries. In light of these assurances, the proposed lease and management agreements do not constitute a diversion of any property from the purposes, uses and trusts to which the cemeteries have been lawfully dedicated. The ultimate financial prudence of this transaction, of course, is beyond the scope of review.

## Conclusion

As set forth in the contemporaneously issued decree, the petition filed by the archdiocese is approved.

## FINAL DECREE

And now, this 4th day of February 2014, upon consideration of the petition filed by the archdiocese of Philadelphia, the addendum thereto, the hearings thereon, and for the reasons set forth in the contemporaneously issued decree, it is hereby ordered:

___

27. 1/6/14 N.T. at 69-70 (O'Shaughnessy).

1. The lease agreement and management agreement between the archdiocese of Philadelphia and StoneMor Operating LLC, StoneMor Pennsylvania LLC, and/or StoneMor Pennsylvania Subsidiary, LLC for the thirteen cemeteries set forth in the archdiocese's petition do not constitute a diversion of any property from the purposes, uses, and trusts to which the cemeteries have been lawfully dedicated.

2. The initial upfront rental payment received by the archdiocese of Philadelphia from the lease agreement may be used by the archdiocese of Philadelphia to address existing obligations of the archdiocese (as set forth in the audited financial statements for the archdiocese of Philadelphia Office for Financial Services for the period ending June 20, 2012) so as to strengthen its overall financial condition in furtherance of its religious, charitable, and educational purposes.

Exceptions to this decree may be filed within twenty (20) days from the entry of the final decree. An appeal from this final decree may be taken to the appropriate appellate court within thirty (30) days from the entry of the decree. *See* Phila. O.C. Rule 7.1.A. and Pa. O.C. Rule 7.1 as amended, and Pa.R.A.P. 902 and 903.